**Marguerite LANDRETH, Respondent,**

**v.**

**Edward LANDRETH, Appellant.**

**No. 54251.**

Supreme Court of Missouri,
Division No. 2.

May 11, 1970.

Rehearing Denied June 8, 1970.

Douglas, Douglas & Douglas, Neosho, Myers, Webster & Perry, Webb City, for respondent.

William O. Russell, Joplin, for appellant, Edward Landreth.

BARRETT, Commissioner.

Marguerite Landreth has been granted a divorce from Edward Landreth. She was also awarded $250.00 monthly alimony and $50,000.00 alimony in gross. Neither of the parties, as was their right if either so desired, requested a finding "on any of the principal controverted fact issues." Sup.Ct. Rule 73.01(b), V.A.M.R. The divorce action and the claim for alimony therefore were tried by the court and "proceedings (shall be) had in such causes as are had in other civil suits." Sup.Ct. Rule 88.01; RSMo 1959, § 452.040. And likewise the appeal "may be taken in the same manner as in other civil actions." Sup.Ct. Rule 88.06; RSMo 1959, § 452.110. The trial court proceeded accordingly and

"finds the issues for the plaintiff on her petition and against the defendant on his cross-claim for divorce." The trial court adjudged the wife, Marguerite, to be "the innocent and injured party" and, as stated, granted her a divorce and awarded her alimony and the husband, Edward, appeals.

It is not necessary to encumber this opinion with a recitation of all the circumstances and the facts may be briefly stated. The plaintiff and the defendant had been married to one another before, just when and for how long does not appear. In the meanwhile they both remarried and had children by those marriages, the plaintiff three and the defendant two. The defendant-appellant, then age 35, was divorced by Nancy Jane Landreth in 1956 and she was awarded the custody of their children, a boy 9 and a girl 14. In 1958 he attempted unsuccessfully to avoid the payment of $175.00 monthly alimony to Nancy Jane and many of the claims he made then are made here and all decided against him. See Landreth v. Landreth, Mo.App., 326 S.W.2d 128. Some indication of his rather extravagant standard of living and that to which he has accustomed his wives may be had from reading the opinion in that case. In any event Marguerite and Edward were married the second time on January 14, 1960 and did not live as husband and wife after the filing of this divorce petition July 20, 1967, although they continued to occupy the same house—their jointly owned home in Webb City.

Marguerite's petition alleged and the divorce was granted on the ground of general indignities, "such indignities to the other as shall render his or her condition intolerable." RSMo 1959, § 452.010. The test of indignities and the function of the trial and appellate courts, as well as all issues involved here, are set forth in the thoroughly documented opinion of Reeves v. Reeves, Mo.App., 399 S.W.2d 641, 644–645, and it is not necessary to repeat the factors in this opinion. As the Reeves case observes the plaintiff wife was of necessity found to be the "innocent party" and impliedly of course she was not guilty of such conduct as would have entitled her husband to a divorce. The circumstances need not be recited in detail, it is sufficient to illustrate briefly the validity and deference due the trial court's finding and decree.

■ The parties had frequent arguments and discussions, the husband said over money but the wife said that she got quite "excited about the condition our marriage was in" particularly when she discovered that he was having an affair with another woman. The husband and the lady admitted numerous telephone calls, some casual and said to be accidental encounters at the farm he was managing, at a teachers' convention and elsewhere, all claimed to be strictly platonic relationship on the highest plane. One of his particularly irritating phone calls was in February 1967 when the plaintiff and defendant were on a business trip in Chicago and the defendant called the lady in Neosho claiming all the while to his wife that the call was to his mother. And then the lady testified to this episode: "Mrs. Landreth had been harassing me and I asked him to get her off my back, and he said there was nothing he could do about it. So then my husband told him to get her off my back, and he told me still there was nothing he could do, but I believe that my husband threatened him, so he (Landreth) told me if I would give her another woman to chase, that she would leave me alone. And so I called her and told her about another woman." And the lady says that it did distract her for a time but soon "she had spread gossip in Neosho." A young boy acquainted with the family, once appeared at the Asbury farm and saw the lady in question in one of the cabins. Marguerite testified that in their discussions and arguments he frequently addressed her with vulgar epithets and he did not deny it. During the last two years he would be gone from noon until four o'clock in the morning and when challenged he would say that it was "None of your Goddamned business." Marguerite said that her husband frequently struck her and she

described three specific occasions. He minimized the episodes, said that he once "swung at her" but "took my frustrations out by sweeping the dressing table clear." This was after one of their arguments in which he described her side of the matter as "yak, yak, yak" or "blah, blah, blah." And he admits that on one occasion, he was driving her to a doctor in Springfield, he had told her to shut up but she kept "yak, yak, yakking" and "in a moment of temper, I guess it was, I backhanded her." He apologized to her, in the presence of her mother and children, for this occasion. In these briefly narrated circumstances "examination of the record * * * leaves us unable to conclude that the action of the trial court in dismissing defendant's cross-bill and in granting a divorce to plaintiff as the innocent and injured party was clearly erroneous; and, with *proper determination of the case depending so largely upon the credibility of the parties* * * * we are not disposed to meddle with those decretal provisions." (Italics supplied.) Reeves v. Reeves, 399 S.W.2d 1. c. 648–649.

■ In contending that the court erred in allowing any sum as alimony in gross the appellant cites but a single case not realizing, apparently, that in that case the court recognized and applied the rule of deference: "the rule of deference nevertheless exists and the allowance of alimony and attorney fees is a matter of sound discretion to be exercised with reference to established principles in view of all the circumstances of each particular case" and so the court was "unwilling to hold that the trial judge abused his discretion." Simmons v. Simmons, Mo.App., 280 S.W.2d 877. The principal thrust of the appellant husband's argument is that his wife had made no contributions to his net estate which he admits has a value of $354,125.00 and which her evidence shows exceeds $400,000.00. He concedes that by work and otherwise she contributed at most approximately $10,000.00 to the Morton Booth Company which he now claims has

little or no value. However, on cross-examination he conceded that the $2000.00 down payment on the house in Webb City came from that company and he admits that he withdrew $1000.00 from that company with which he purchased his son an automobile, another $1000.00 for remodeling, $7900.00 for an oil investment and $2300.00 for personal and household needs. Then there was a withdrawal of cash of $350.00, personal expenses $800.00 and $800.00 for a boat. In June 1965 Marguerite instituted a divorce suit but they were reconciled on July 29, 1966, when Edward had her sign, as the only thing he wanted, the statement "I won't say or be on Ed's back, ever." At that time he promised to return to her a diamond ring, buy a house in their joint names, "and I agreed I would place future investments in her name also, and in time would place investments in our joint names." He was to execute a will with her as executor but the only promise he kept was to place the $17,000.00 house in their joint names and it is now encumbered with a mortgage of $11,000.00 and unpaid taxes. And he concedes, as she testified, that she paid for most of the household furnishings from her separate earnings as a part-time school nurse. As to the handling of finances he said that he "did all of the business thinking for the benefit of the entire family." At another point he said that his wife "had not expressed any reservation about the nature of the investments I made. I think it would be fair to say that she * * let my judgment prevail as to the type of investments." While he now claims that he had purchased some of his common stocks before their marriage, significant here is his concession that "everything on this sheet (his compilation of assets showing a net worth of $354,125.00) was acquired by you during this marriage."

Numerous factors enter into the granting of alimony, in some instances a significant factor may be "the contributions of each to the property accumulated during marriage" but as the court said in the Reeves case: "Each action brings its own facts

and presents its own problems; and, in the final analysis, each determination must be governed by, and must rest upon, the particular circumstances of that case. * * * The amount properly allowable is a matter committed to the sound judicial discretion of the trial chancellor, whose conclusion will be modified or set aside only for manifest abuse of that discretion" and so again the court of appeals deferred to the trial court, 399 S.W.2d l. c. 651. Two particularly persuasive cases especially upon the facts as to the composition and acquisition of the net estates, one in 1920, the other in 1923, are Hoecker v. Hoecker, Mo., 222 S.W. 387 and Reynolds v. Reynolds, 297 Mo. 447, 249 S.W. 407. In the Hoecker case there was an award of alimony in gross of $20,000.00 and $1000.00 attorney's fee from a net estate of $80,000.00 and this court "carefully weighed and considered the evidence before us, and are unable to say that the amount allowed in this case was excessive." In the Reynolds case there was an award of alimony in gross of $20,789.76 from a net estate of $70,000.00 and this court deferred to the discretion of the trial court concluding that "(t)he allowance in the instant case is not shown to be unreasonable." See also Rickard v. Rickard, Mo.App., 428 S.W.2d 919 in which the wife claimed gross inadequacy in an allowance of alimony.

For the reasons indicated the judgment is affirmed.

STOCKARD, C., concurs except as to alimony in gross.

PRITCHARD, C., not sitting.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.